IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEFFIER H. SAVARY, <br><br> Petitioner, <br><br> v. <br><br> ERIC ARNOLD, Warden, <br><br> Respondent. | NO. CV 16-6140-VBF (AGR) <br><br> ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF MAGISTRATE JUDGE |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the Petition for Writ of Habeas Corpus, the other records on file herein, the Report and Recommendation of the United States Magistrate Judge ("Report"), and the Objections to the Report. Petitioner's application for an extension of time to re-type his objections to the Report is DENIED as unnecessary. (Dkt. No. 155.)

The Court has engaged in a *de novo* review of those portions of the Report to which objections have been made. The Court accepts the findings and recommendation of the Report.

In addition to his objections, Petitioner has filed a series of motions, which the Court addresses below.

A. <u>Motion for Leave to File Second Amended Petition for Writ of Habeas Corpus and Motion for Stay</u>

Petitioner has filed a motion for leave to file a Second Amended Petition for Writ of Habeas Corpus ("SAP") (Dkt. No. 154) and a motion for a stay of this nine-year-old case while he exhausts new grounds for relief in the SAP (Dkt. No. 153). For the reasons set forth below, both motions are DENIED.

1. <u>Proposed New Grounds for Relief</u>

The SAP, which is lodged seven years after the statute of limitations expired, contains new proposed Grounds 19 through 24 that are admittedly unexhausted. (Dkt. No. 154 at 17-19.) The proposed new grounds are wholly without merit and amendment would be futile. *See Lee v. Thornell*, 118 F.4th 969, 990-92 (9th Cir. 2024) (affirming denial of leave to amend habeas petition as futile when proposed grounds were untimely and without merit).[1] For this reason, the proposed new grounds for relief do not warrant a stay of proceedings. A stay may be appropriate when (1) "the district court determines there was good cause for the petitioner's failure to exhaust his claims first in state court"; (2) his unexhausted claims are potentially meritorious"; and (3) "there is no indication that the petitioner engaged in intentionally dilatory tactics." *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005). As to the second element, a petitioner "must establish that at least one of his unexhausted claims is not 'plainly meritless.'" *Dixon v. Baker*, 847 F.3d 714, 722 (9th Cir. 2017) (noting court examines whether "it is perfectly clear that the petitioner has no hope of prevailing"). Petitioner cannot make this showing.

---

[1] Petitioner's conviction became final on August 11, 2015, 90 days after the California Supreme Court denied review on May 13, 2015. (Report at 2); *Bowen v. Rowe*, 188 F.3d 1157, 1159 (9th Cir. 1999). Petitioner commenced filing state habeas petitions before his conviction became final and is entitled to statutory tolling through March 29, 2017, when the California Supreme Court denied the state habeas petition. (Report at 2.) The one-year statute of limitations expired one year later on March 29, 2018. 28 U.S.C. § 22449(d)(1)-(2). While the FAP is timely (Dkt. No. 51), Petitioner did not lodge the SAP until April 25, 2025, when it was mailed to the court. (Dkt. No. 154-1 at 199-200.) The SAP was lodged over seven years after the one-year statute of limitations expired.

2

In proposed Ground 19, Petitioner contends that the state court acted in excess of its jurisdiction by entering judgment for first degree murder "despite limiting the jury instructions to second-degree only." (Dkt. No. 154-1 at 145; Dkt. No. 154 at 17; Dkt. No. 154-1 at 141-49.) Petitioner is incorrect. The jury was instructed on both first- and second-degree murder. (7RT 3024-29.)

Proposed Ground 20 is based on a pending petition in Superior Court under the California Racial Justice Act ("CRJA"). (Dkt. No. 154 at 17-18.) The CRJA prohibits state criminal convictions and sentences "on the basis of race, ethnicity, or national origin." Cal. Penal Code § 745 (a). A criminal defendant has the burden of proving a CRJA claim by a preponderance of the evidence. *Id.* Federal habeas relief, however, is available only when a petitioner has been convicted or sentenced in violation of the Constitution, laws, or treaties of the United States. 28 U.S.C. § 2254(a). State law errors are not cognizable on federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67 (1991). Even assuming the state courts ultimately reject Petitioner's CRJA claims, the state courts' denial would not give rise to a cognizable federal habeas claim. *E.g., Stephens v. Matterson*, 2024 U.S. Dist. LEXIS 236658, *7 (C.D. Cal. Aug. 22, 2024), *accepted by* 2025 U.S. Dist. LEXIS 4006 (C.D. Cal. Jan. 7, 2025) ("To the extent Petitioner intends to seek relief directly under the CJRA . . . , Petitioner [] cannot state a cognizable habeas claim."); *Muniz v. Phillips*, 2024 U.S. Dist. LEXIS 58124, *9-*10 (C.D. Cal. Mar. 28, 2024) ("Claims brought under the CRJA are . . . not cognizable under federal habeas review."); *Brooks v. McDowell*, 2024 U.S. Dist. LEXIS 23399, *7 (N.D. Cal. Feb. 9, 2024) (same).

Proposed Grounds 21, 23 and 24 are based on pending petitions for resentencing in Superior Court. Proposed Ground 21 is based on a state petition filed under Cal. Penal Code § 1170(b)(6),[2] Proposed Ground 23 is based on a

---

[2] As relevant to Petitioner's argument, Section 1170(b)(6) provides that, when a criminal statute specifies three possible terms of imprisonment, "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances" such that imposition of the lower term "would be contrary to the
(continued…)

3

state petition to strike the firearm enhancement under Senate Bill 620,[3] and proposed Ground 24 is based on a pending state petition for recall of sentence pursuant to Cal. Penal Code § 1170.91 (Senate Bill 1209). (Dkt. No. 154 at 18-19; Dkt. No. 154-1 at 150-58, 160-77.) Again, even assuming the state courts ultimately reject the petitions for resentencing, the state courts' application of state resentencing laws would not present a cognizable claim on federal habeas review. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir. 1989) (finding federal habeas relief unavailable for claims based on state sentencing laws); *Collins v. Warden*, 2024 U.S. Dist. LEXIS 195609, *2 (N.D. Cal. Oct. 28, 2024) (holding claims under Cal. Penal Code §§ 1170(b) and 1170.91 are not cognizable under federal habeas review); *Thomas v. Matterson*, 2024 U.S. Dist. LEXIS 63139, *5-*8 (C.D. Cal. Apr. 5, 2024) (holding claim under Senate Bill 620 is not cognizable under federal habeas review); *Cummings v. CDCR Dir.*, 2022 U.S. Dist. LEXIS 66029, *7-*8 (C.D. Cal. Apri. 5, 2022) (holding § 1170(b) (Senate Bill 567) claim "is a question pertaining solely to California law" and is "not cognizable in a federal habeas proceeding"), *accepted by* 2022 U.S. Dist. LEXIS 66013 (C.D. Cal. Apr. 7, 2022).

Lastly, in proposed Ground 22, Petitioner seeks a court order requiring the prison where he is incarcerated to permit visits with Roselle Savary.[4] (Dkt. No.

---

interests of justice, the court shall order imposition of the lower term if . . . a contributing factor in the commission of the offense" was the defendant's "psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence." Cal. Penal Code § 1170(b)(6)(A).

[3] Senate Bill 620 amended Cal. Penal Code §§ 12022.5 and 12022.53 to grant trial courts the discretion to strike certain firearm enhancements. *See People v. Tirado*, 12 Cal. 5th 688, 695-96 (2022).

[4] Petitioner was convicted of dissuading Ms. Savary from testifying at his murder trial and conspiracy to commit murder. (LD 18 at 365-66; Dkt. No. 70-6 at 159-60.) With respect to his conspiracy conviction, the Report describes the factual background: "When [Ms. Aguilar] visited Mr. McCain at his office, he showed her the letter [Petitioner] had written from jail in Texas. The letter instructed Mr. McCain to 'eliminate' or 'kill' Mr. Anderson and Ms. Savary to 'make sure they weren't around for trial.'" (Report at 20 (quoting LD 4 at 17.) However, Ms. Aguilar subsequently delivered a note to Mr. McCain. Ms. Aguilar "understood the note to mean that there was a plan to kill both Mr. Anderson and
(continued…)

154 at 18; Dkt. No. 154-1 at 190-98.)  This ground is not cognizable in federal habeas review because it does not challenge Petitioner's conviction, sentence, or duration of confinement.  *See Muhammad v. Close*, 540 U.S. 749, 750 (2004) (per curiam) ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus.").  Complaints about visitation may be asserted, if at all, in a separate civil rights action.  *See Nettles v. Grounds*, 830 F.3d 922, 933 (9th Cir. 2016) (en banc) ("a § 1983 action is the exclusive vehicle for suits about prison life").

### 2. New Evidence

Petitioner requests a stay while he presents additional evidence to the state courts, apparently in support of his various recent state petitions.  Petitioner has not shown how his additional evidence strengthens his existing grounds for relief in this case to the point that any one of them would become "potentially meritorious."  *Gonzalez v. Wong*, 667 F.3d 965, 980 (9th Cir. 2011).

### Gang Expert Declarations

Petitioner presents two declarations from a gang expert, Ms. Lent, dated June 17, 2024 and February 17, 2025.  (Dkt. No. 154-1 at 42-48.)  Lent's declarations refer to the standards in Senate Bill 243 and Senate Bill 467.  (*Id.* at 46, 47.)  Senate Bill 467 went into effect on January 1, 2023 and amended Cal. Penal Code § 1473 to allow the filing of state habeas petitions under certain circumstances.  *See Baptiste v. Mattison*, 2024 U.S. Dist. LEXIS 56510, *6-*8 (C.D. Cal. Feb. 6, 2024) (finding state courts' denial of § 1473 petition does not state cognizable claim on federal habeas review), *accepted by* 2024 U.S. Dist. LEXIS 54209 (C.D. Cal. Mar. 25, 2024), *certificate of appealability denied*, 2025 U.S. App. LEXIS 9327 (9th Cir. Feb. 11, 2025).

---

Ms. Savary, but that defendant had a change of heart and wanted to keep Ms. Savary alive. . . .  She gave the note to Mr. McCain '[t]o keep [Ms. Savary] alive' even though it meant that Mr. Anderson would be killed."  (*Id.* at 20 (quoting LD 4 at 17.)  Petitioner was convicted of conspiracy to commit murder of Mr. Anderson.  (LD 20 at 2123; Dkt. No. 70-18 at 122.)

5

  Presumably, Lent's declarations relate to Petitioner's *Napue* claims in Grounds Six and Eight, which require a showing that (1) the testimony or evidence was actually false; (2) the prosecution knew or should have known that testimony or evidence was actually false; and (3) there is a reasonable likelihood that the false testimony could have affected the judgment of the jury.  (Report at 44); *Catlin v. Broomfield*, 124 F.4th 702, 741 (9th Cir. 2024).  The California Supreme Court summarily denied these claims.  (Report at 43-44; Dkt. No. 70-23.)

  Detective Rodriguez was called as a witness during the prosecution's rebuttal.  As the Report discusses, Detective Rodriguez testified that Smith's last documented gang-related arrest occurred in 1995 and he was with the 74th Street Crips, Hoover, Los Angeles.  Between 1995 and his death in 2008, Smith had arrests but none were gang-related.  (7RT 2830-31, 2833, Dkt. No. 70-13 at 132-33, 135.)  On cross examination, defense counsel pointed out two tattoos on Smith's body that said H74LA and "for criminals."  Rodriguez testified that the H74LA tattoo indicated 74th Street Crips, Hoover, Los Angeles, and that he knew of the Hoover Crips.  Rodriguez testified, however, that he did not know whether Hoover Criminals (a) had at one time been a subset of the Hoover Crips; (b) had any allies with Bloods sects, or (c) were at war with any Crips sects.  (7RT 2833-35, Dkt. No. 70-13 at 135-37.)

  As relevant here, Lent's declarations opine primarily that the "Hoover Crip gang" began to have "wars and rivalries" with other Crip gangs in 1992 and ultimately dropped the Crip label.  According to Lent, in 1995 all Hoover "gang sets" were called Hoover Criminals except for the 5-Deuce Hoover Crips.  The Hoover Criminals are rivals of some Crip and some Blood gangs, but not all.  Lent opines that in 1995 Smith was a Hoover Criminal gang member and not a Crip.  (Dkt. No. 154-1 at 47.)  Lent does not state that she has personal knowledge of Smith or his claimed gang affiliation.

1    Lent's declarations do not establish that Rodriguez's testimony was actually
2 false or that the prosecution knew or should have known that the testimony was
3 actually false. "Testimony that is simply inconsistent or equivocal may not rise to
4 the level of actual falsity." *Catlin*, 124 F.4th at 741. Rodriguez testified that Smith
5 was a Crip in 1995 based on his arrest record. Even assuming the 1995 arrest
6 record incorrectly identified Smith's gang affiliation (either because Smith
7 identified the wrong gang or the arrest record was incorrect for some other
8 reason), there is no evidence that Rodriguez or the prosecution knew or should
9 have known that the 1995 arrest record identified the wrong gang. In addition,
10 there is no evidence as to when Smith obtained the H74LA tattoo, before or after
11 the Hoover Crip gang's name change.

    More importantly, even assuming the Hoover Crips had changed their
12 name by the time of Smith's 1995 arrest, Petitioner has not shown a reasonable
13 likelihood that Rodriguez's testimony could have affected the judgment of the jury.
14 For the defense, the significance of Smith's gang affiliation was simply to provide
15 a defensive explanation as to why Petitioner obtained a gun, went to the party
16 with a loaded gun in his front pocket, shot Smith, and then left town (evading
17 arrest for three years). Petitioner testified that he investigated and found out that
18 his wife, Roselle Savary, was cheating on him with Smith. (6RT 2479; Dkt. No.
19 70-12 at 81.) On the day of the shooting, Petitioner went to the party with a
20 loaded gun in his right front pocket. (6RT 2494; Dkt. No. 70-12 at 96.) Petitioner
21 testified that "I did find out he was a gangbanger." "[H]e was not someone you
22 want to mess with." "It did scare me." (6RT 2480-81, Dkt. No. 70-12 at 82-83.)
23 Petitioner testified that, when he arrived outside the party, Smith said, "What up,
24 Cuz? What the fuck you doing over here, Cuz?" (6RT 2496, Dkt. No. 70-12 at
25 98.) The defense gang expert testified that the term "Cuz" is a common Crips
26 term. (6RT 2538; Dkt. No. 70-12 at 140.) Petitioner saw Smith reach for his back
27 pocket, saw a gun, and shot Smith first. (6RT 2497; Dkt. No. 70-12 at 99.)
28 Petitioner testified that, the next day, Sleep told him that "You killed a homey.

You know what's next." (6RT 2502-03; Dkt. No. 70-12 at 104-05.) Petitioner understood that he was a dead man and the target of retaliation. (6RT 2503-04; Dkt. No. 70-12 at 106.) Whether Smith had been a member of the Hoover Crips or Hoover Criminals would not affect this defense. Indeed, Petitioner did not testify that he knew to which gang Smith had belonged.

Lent's declarations may also be relevant to Petitioner's related Ground Ten, Subclaim 4, in which Petitioner argues ineffective assistance of trial counsel for failure to impeach Detective Rodriguez on Smith's correct gang. (Report at 65.) As discussed above, Rodriguez acknowledged on cross examination that he did not know whether Hoover Criminals (a) had at one time been a subset of the Hoover Crips; (b) had any allies with Bloods sects, or (c) were at war with any Crips sects. (7RT 2833-35, Dkt. No. 70-13 at 135-37.) Defense counsel attempted to question Rodriguez further on the historical split between Hoover and the Crips, but the trial judge sustained objections based on lack of foundation. (7RT 2834-35; Dkt. No. 70-13 at 136-37.) If anything, the defense could reasonably have believed that the Crips name would likely be more well known to a jury as a dangerous gang than the Hoover Criminals. Petitioner fails to show either deficiency or prejudice.

For these reasons, Lent's declarations do not strengthen Petitioner's existing grounds for relief to the point that any one of them would become "potentially meritorious."[5] *Gonzalez*, 667 F.3d at 980.

Investigator Witness Interview Report

Petitioner attaches an investigator report of an interview with McCain dated January 14, 2025. (Dkt. No. 154-1 at 50-52.) In the interview, McCain confirms

---

[5] Lent's other points do not fare any better. For example, Lent states that Rodriguez "wrongfully mislead the jury when he stated Mr. Savary was throwing up a Jamaican Mafia hand sign." (Dkt. No. 154-1 at 45.) Lent mistakenly refers to Rodriguez's testimony *outside* the presence of the jury at a Cal. Evid. Code § 402 hearing. The trial judge precluded Rodriguez from testifying about Petitioner and the Jamaican Mafia, and Rodriguez followed the judge's evidentiary ruling. (7RT 2823-24; Dkt. No. 70-13.)

that law enforcement did not transfer Petitioner's music production equipment to him after the trial. (*Id.* at 51.)

At best, this interview report relates to Petitioner's *Brady* claims in Grounds Nine and Fifteen, in which Petitioner contended the prosecution gave McCain Petitioner's property for his testimony. (Report at 54-56.) The interview report may also relate to Petitioner's ineffective assistance claim based on trial counsel's failure to investigate the location of his laptop in Ground Ten, Subclaim 2. (Report at 60-61.) The Report explains the post-trial proceedings in the record regarding McCain's claims to the musical content on some of Petitioner's equipment. According to the interview report, McCain states that he did not receive Petitioner's music production equipment. The interview report does not strengthen any existing ground for relief to the point that any one of them would become "potentially meritorious." *Gonzalez*, 667 F.3d at 980; Report at 54-56, 60-61.

## Psychologist's Declaration

Petitioner attaches a declaration dated April 4, 2025 from Dr. Roeder, a psychologist. (Dkt. No. 154-1 at 54-56.) Dr. Roeder opines about two subjects.

First, according to Dr. Roeder, Petitioner told him that a key witness had changed her testimony after being detained. Petitioner asked him to opine about the susceptibility of a witness who suffered from ADHD and was off her medication. Dr. Roeder opined that the witness "would be more vulnerable to influence and/or manipulation." (*Id.* at 54 ¶ 3.)

This portion of Dr. Roeder's declaration is presumably related to Petitioner's *Napue* claim in Grounds Six and Eight based on the testimony of Marilyn Aguilar, his girlfriend, at his second trial. Petitioner contends that Aguilar told the truth when she was arrested but subsequently changed her statement as a product of her ADHD and lack of medication. (Report at 47-48.) Petitioner still has not identified any specific testimony that is actually false, or that the prosecution knew or should have known was actually false. (*Id.*) Nor does

Petitioner provide any evidence that Aguilar suffered from ADHD or took medication. The existence of inconsistency or impeachment does not equate to actual falsity. *Catlin*, 124 F.4th at 741; *United States v. Zuno-Arce*, 339 F.3d 886, 890 (9th Cir. 2003).

Second, Dr. Roeder interviewed Petitioner on April 2 and 3, 2025, during which Petitioner described childhood and military trauma. Based on Petitioner's "description of his experiences," Dr. Roeder opined that Petitioner's PTSD (1) "was likely a significant contributing factor in his crime, as he exhibited poor judgment and decision making and even irrational thinking in confronting the victim" and (2) "would appropriately be considered a mitigating factor in the seriousness of his offense." (Dkt. No. 154-1 at 55 ¶ 6; *Id.* at 55 ¶¶ 4-5.)

This portion of Dr. Roeder's declaration is presumably related to Petitioner's ineffective assistance claims based on trial counsel (Ground Ten, Subclaim 2) and sentencing counsel (Ground Twelve). (Report at 62-63, 71-72.) "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Through Dr. Roeder's declaration, Petitioner essentially presents a new and different defense based on post-trial diagnoses. In contrast to Dr. Roeder's declaration, Petitioner testified at trial that when he arrived outside the party, Smith appeared to be high and confronted Petitioner. Trying to show he was there in peace, Petitioner extended his hand out to shake Smith's hand. Smith did not shake his hand and said "Fuck you, Cuz." Petitioner responded that he did not want any problems and asked Smith to "leave my wife alone." (6RT 2496-97, Dkt. No. 70-12 at 98-99.) Petitioner saw Smith pull out a gun. Petitioner pulled out his gun and shot first, only once. (6RT 2498; Dkt. No. 70-12 at 100.) He did not mean to kill Smith. Petitioner grabbed Smith's gun, wiped off his prints from both guns and bullets, put everything in a McDonald's bag, and threw it

away at a McDonald's.  (6RT 2499-2500; Dkt. No. 70-12 at 101-02.)  The defense toxicology expert testified that Smith had cocaine, methamphetamine, and alcohol in his system when he died.  This combination could cause the person to behave erratically with diminished judgment, and could also cause jerking and rapid hand movement.  (Report at 11-12.)

Petitioner's testimony essentially describes a self defense scenario in which he was the faster shooter given his military training and Smith's substance abuse.  (7RT 2735; Dkt. No. 70-13 at 37.)  Petitioner's testimony did not raise a mental health issue.  Petitioner did not testify about trauma during his childhood or military service.  (6RT 2469-75; Dkt. No. 70-12 at 71-77.)  Petitioner had seen his wife with Smith before the shooting without ever confronting Smith.  (6RT 2571-72; Dkt. No. 70-12 at 173-74.)  Petitioner had previously talked to Smith at Anderson's home without any confrontation.  (6RT 2574-75, 2579-80; Dkt. No. 176-77, 181-82.)  Moreover, Petitioner was cross examined about his recorded calls and visits with Aguilar, in which he talked about coming up with a post-traumatic stress defense.  "I was exploring different options because of the fact that I was told [by McCain] that self-defense without a registered firearm is no self defense.  So I had to try to figure out what else I could use then, because I knew it was self-defense, but if I couldn't use self-defense, then what else can I use?"[6]  (6RT 2555; Dkt. No. 70-12 at 157.)  Counsel could reasonably conclude based on the evidence that any PTSD defense would be unconvincing and that the most viable defense was self defense or imperfect self defense.  (7RT 3021-23, 3026-27; Dkt. No. 70-13 at 177-79, 182-83); *see Waidla v. Davis*, 126 F.4th 621, 639 (9th Cir. 2024) (finding fair minded jurists could conclude mental state defense would not be persuasive based on evidence); *Crittenden v. Ayers*, 624 F.3d 943,

---

[6] Petitioner said he had been stationed in Alaska, isolated from the population and in below-freezing temperatures.  (6RT 2554; Dkt. No. 70-12 at 156.)  In a recorded call, Petitioner told Aguilar he would be seeing a psychiatrist "so I might be seeing you know, hearing shit and seeing demons and shit like that."  (1CT 136; Dkt. No. 70-5 at 149.)

960-63 (9th Cir. 2010) (finding lack of prejudice when counsel presented alibi defense over mental state defense based on evidence).

      Petitioner raises his childhood trauma for the first time in his declaration dated November 5, 2024, and states he had no idea he was "screwed-up in the head" before taking self-help groups in prison. (Dkt. No. 154-1 at 85.) Nothing in the record indicates trial counsel or sentencing counsel was on notice of such severe childhood trauma. Petitioner testified at trial to his successful academic and artistic accomplishments in high school in Miami, and to attending college in Pasadena on a full scholarship. (6RT 2469-71, Dkt. No. 70-12 at 71-73.) Sentencing counsel referred to this testimony during sentencing. (7RT 4852-53; Dkt. No. 70-13 at 103-04.) Although Petitioner cites to transcripts of jail recordings of his communications with Aguilar, the pages do not contain information that even remotely resembles the severe beatings and abuse Petitioner describes in his November 5, 2024 declaration and interviews with Dr. Roeder in April 2025. In the jail recordings, Petitioner said he never got along with his mother, who was a pastor, and felt she hated him. His grandmother was the only one who loved him. His grandmother told his mother that she was not raising him right, and his mother threw her out of the house. Petitioner still spoke to his father once in a while. (1CT 174-76; Dkt. No. 70-5 at 187-89.) Petitioner said his mother was jealous. He would call his grandmother "mom" and he would get "cussed out" for that. If his grandmother bought him a gift, his mother would take it away from him. (1CT 176-77, 179-80; Dkt. No. 70-5 at 189-90, 192-93.) His mother tried to get people to turn Petitioner in if they saw him and cared only whether he accepted God in his heart. (1CT 143; Dkt. No. 70-5 at 143.) In this action, Petitioner raises his childhood trauma in his proposed SAP, years after he commenced this action in 2016.[7] *See Benson v. Chappell*, 958 F.3d 801, 830

---

[7] In a new unsigned statement dated in April 2025, Petitioner states in conclusory fashion that he told trial counsel that he suffered "childhood trauma" and does not mention sentencing counsel. (Dkt. No. 154-1 at 139.) The statement is not signed under penalty of perjury and the one sentence about

(continued…)

(9th Cir. 2020) (finding that, with no suggestion of severe childhood abuse and in light of countervailing positive evidence, "counsel cannot be faulted for not investigating a suspicion of suppressed past trauma").

The Court expresses no view as to Petitioner's pending state petitions for resentencing or other relief under California law.  With respect to Petitioner's existing grounds for relief in this Court under federal habeas review, Dr. Roeder's declaration, together with Petitioner's new declaration, do not strengthen any existing ground for relief to the point that any one of them would become "potentially meritorious."  *Gonzalez*, 667 F.3d at 980; Report at 54-56, 60-61.

B.  Motion to File Late Declarations

Petitioner's wife, Roselle Savary, invoked the marital privilege at the preliminary hearing and did not testify at the murder trial.  (Report at 61.)

Petitioner now states that Ms. Savary "says she will do a new declaration to waive marriage privilege 'after' she has filed for U.S. citizenship."  (Dkt. No. 152.)  However, Ms. Savary does not yet have funds to apply for citizenship.  Petitioner also states that he may wish to file new declarations from a handwriting expert and Dr. Roeder.  Petitioner provides no estimated dates of completion.

Petitioner essentially asks for an indefinite stay of proceedings.  One purpose of the AEDPA "is to 'reduce delays in the execution of state and federal criminal sentences.'"  *Rhines*, 544 U.S. at 277 (citation omitted).  "Without time limits, petitioners could frustrate AEDPA's goal of finality by dragging out indefinitely their federal habeas review."  *Id.* at 278.  For the reasons discussed above, Petitioner has not made the showing required for a stay of proceedings based on his proposed new unexhausted grounds and his new evidence related to existing grounds for relief.  An indefinite stay based on future declarations that may never arrive would be inappropriate and Petitioner's motion is DENIED.[8]

---

childhood trauma does not describe any specific information Petitioner allegedly gave to trial counsel or when he allegedly did so.  That single unsworn sentence does not render any existing ground potentially meritorious.

[8] The Report addresses the handwriting expert.  (Report at 46, 63-64.)

    C. <u>Motion for Return of Property, Motion for Discovery of Peace Officer Personnel Records (Pitchess Motion) Pursuant to [Cal.] Evid. Code §§ 1043, 1045, and Motion for Discovery</u>

Petitioner has filed a motion for an order requiring the Los Angeles County Sheriff's Department (LASD) or any other government entity having custody over his personal property in his underlying criminal cases to return it. (Dkt. No. 149.) Petitioner has also filed a motion for discovery of personnel records of Detective Espino, whom he accuses of not returning that property (Dkt. No. 151) and a motion for discovery that, in part, seeks further discovery about Petitioner's property (Dkt. No. 148).[9]

The Report describes the post-trial proceedings regarding return of Petitioner's property. (Report at 55-56.) The trial court stated: "Unless you can agree formally with the People regarding release of personal property, defense file a motion for return of property, and the court will address it formally." (4RT 2705; Dkt. No. 70-18 at 202.) Petitioner does not claim to have filed such a motion in state court.

Petitioner's motion for return of property is DENIED. Federal habeas relief is available "on the ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal habeas court reviews challenges to the fact or duration of a petitioner's custody. *See Bailey v. Hill*, 599 F.3d 976, 982 (9th Cir. 2010) (holding state prisoner's in-custody challenge to restitution in criminal sentence is not cognizable). As this Court previously ruled in the Order dated March 29, 2022 (Dkt. No. 118), Petitioner's motion for return of his property is not cognizable on federal habeas review. *See also Calderon v. Fisher*, 2020 U.S. App. LEXIS 22225 (9th Cir. Sept. 10, 2020) (noting "habeas proceeding is not the proper remedy to obtain the return of property"); *Burgess v. California*, 2022 U.S. Dist.

---

[9] The Court considers the remainder of Petitioner's motion for discovery below.

LEXIS 166110, *2-*3 (E.D. Cal. Sept. 14, 2022) (holding property claims are not cognizable on federal habeas review; collecting cases).

Petitioner's related motions for discovery are also DENIED. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In a habeas action, a court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rule 6(a), Rules Governing Section 2254 Cases in the United States District Courts. "A party requesting discovery must provide reasons for the request." Rule 6(b). To show good cause, Petitioner must demonstrate that "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 909. Speculation is insufficient. *Id.*; *Earp v. Davis*, 881 F.3d 1135, 1142-43 (9th Cir. 2018) ("'Just as bald assertions and conclusory allegations do not afford a sufficient ground for an evidentiary hearing, neither do they provide a basis for imposing upon the state the burden of responding in discovery to every habeas petitioner who wishes to seek such discovery.'")

Petitioner previously attached a search warrant return signed by Detective Espino that listed Petitioner's property (Dkt. No. 121 at 7) and a search warrant from Marilyn Aguilar's criminal case that listed property Petitioner claims as his (Dkt. No. 121 at 35-36.) Petitioner also attached a letter dated March 22, 2022 from the Office of the Sheriff notifying Petitioner that: "We received your request for information on an active warrant and/or court disposition. The information you seek is under the jurisdiction of the court." (*Id.* at 19.) The Office of the Sheriff previously responded to Petitioner with the same information in a letter dated April 23, 2021. (*Id.* at 22.) In denying Petitioner's motions for discovery in this action, the magistrate judge reminded Petitioner of the state court's admonition that he must file a motion for return of property in that court. (*See* Dkt. Nos. 94, 99, 124.)

Petitioner's renewed motion for discovery of Detective Espino's personnel file appears to be based on Petitioner's contention that his new evidence shows Espino kept the property for himself. Petitioner is incorrect. According to the investigator's interview report discussed above, "McCain said the LAPD had the production equipment, but they did not give it to him." (Dkt. No. 154-1 at 51.) The record also belies Petitioner's contentions that Detective Espino unlawfully seized the property without documentation of chain of custody, unlawfully transferred the property to McCain, and deprived Petitioner of this exculpatory/impeachment evidence in violation of *Napue* and *Brady*. (Report at 45-46, 55-56.) Both motions for discovery of property-related materials are denied for the further reason that Petitioner's claim for return of property is not cognizable under federal habeas review. See *Bracy*, 520 U.S. at 909.

D. Motion for Order Correcting Record and Allowing Visits with Roselle Savary

Petitioner has filed a motion for a court order to the prison correcting the record and requiring the prison to allow visits with Roselle Savary. (Dkt. No. 147.)

As discussed above in connection with proposed Ground 22, Petitioner's requested relief is not available in a habeas proceeding. See *Muhammad*, 540 U.S. at 750 ("Challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus."). Complaints about visitation may be asserted, if at all, in a separate civil rights action. See *Nettles*, 830 F.3d at 933 ("a § 1983 action is the exclusive vehicle for suits about prison life"). Petitioner's motion is DENIED.

E. Motion to Consider Evidence and Expand the Record

Petitioner has filed a motion to expand the record to include the new evidence attached to his proposed SAP. (Dkt. No. 150.)

The letter from Delancey Street dated February 8, 2012 is already part of the record. (Dkt. No. 70-21 at 279.) Petitioner's motion as to this document is DENIED as unnecessary. (Dkt. No. 150 at 33.) The motion as to other

documents from Delancey Street, which explain the program or post-date sentencing, are DENIED as unnecessary to resolve the operative petition. See *Perez v. Ducart*, 2019 U.S. Dist. LEXIS 108907, *21 n.5 (N.D. Cal. June 28, 2019) (denying motion to expand record to include unnecessary documents).

The Court declines to expand the record to include all remaining documents, which are submitted in support of the proposed SAP and were not submitted to the state courts that adjudicated Petitioner's claims on the merits. *Cullen v. Pinholster*, 563 U.S. 170, 185-86 (2011); see *Rodriguez v. Thornell*, 2025 U.S. Dist. LEXIS 6882 (9th Cir. Mar. 25, 2025) (finding district court did not abuse discretion in declining to expand record to include documents not submitted to state court). Petitioner's motion is DENIED.

F. Motion for Discovery

Petitioner filed a motion for wide-ranging discovery in support of his proposed SAP. (Dkt. No. 148.) The motion inexplicably requests discovery that would be futile: Petitioner includes proposed questions to Aguilar, who he states is deceased, and proposed questions to Roselle Savary, who has claimed the marital privilege. (*See* Section B above.)

More broadly, as discussed above, a party must show good cause for discovery in a habeas action. Rule 6(a). To show good cause, Petitioner must demonstrate that "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief." *Bracy*, 520 U.S. at 909. The Court has denied Petitioner's motion for leave to file the SAP and, therefore, Petitioner does not show good cause for discovery related to his proposed Grounds 19-24.

To the extent Petitioner seeks discovery as to existing grounds for relief, Petitioner also fails to show good cause.

Petitioner does not show good cause for discovery of Aguilar's plea deal with the prosecution because the defense had that information at trial. Aguilar testified that she had been arrested on May 5, 2011 and charged with conspiracy

to commit murder and dissuading a witness. Aguilar had no previous record and, by the time of her trial testimony, had been incarcerated for over one year. (4RT 1820, 1855, 1867; Dkt. No. 70-18 at 32, 67, 79.) She gave a videotaped statement to the prosecution in November 2011. (4RT 1856-57; Dkt. No. 70-18 at 68-69.) On the Friday before her July 16, 2012 trial testimony, she pled no contest to dissuading a witness. (4RT 1857; Dkt. No. 70-18 at 69.) Aguilar was required to testify truthfully at Petitioner's trial. (4RT 1858; Dkt. No. 70-18 at 70.) On cross examination, Aguilar acknowledged that, as part of her plea deal, she would receive time served whereas she was facing 25 years to life if convicted. (4RT 1867-68; Dkt. No. 70-18 at 79-80.) Defense counsel cross examined Aguilar based on her initial statement to police that she did not understand the contents of the note she handwrote. The jury heard her explanations for any alleged inconsistencies. (4RT 1868-70, Dkt. No. 70-18 at 80-82.)

      Petitioner does not show good cause for discovery of whether Aguilar had a diagnosis of ADHD and wore glasses. Although Petitioner argues that this discovery would be relevant to his *Brady* claim, Petitioner's motion acknowledges that Petitioner knew Aguilar, his girlfriend, had ADHD and wore glasses. (Dkt. No. 148 at 2.) The prosecution (assuming it had this evidence) cannot have suppressed it within the meaning of *Brady* when the defense knew it existed. *Cunningham v. Wong*, 704 F.3d 1143, 1154 (9th Cir. 2013); *Raley v. Ylst*, 470 F.3d 792, 802-03 (9th Cir. 2006).

      Petitioner does not show good cause for his request that the court subpoena Aguilar's attorney and family members to testify about whether they ever heard Aguilar make statements that she was innocent, that she lied at Petitioner's trial, and the like. Petitioner's request is based on mere speculation and amounts to an impermissible fishing expedition. *Earp v. Davis*, 881 F.3d 1135, 1144 (9th Cir. 2018) (affirming denial of request "to fish for evidence that may support a defense theory" in habeas proceedings; "This is exactly the type of fishing expedition we are admonished not to permit."); *Calderon v. U.S. Dist. Ct.*,

98 F.3d 1102, 1106 (9th Cir. 1996) (courts should not permit use of "federal discovery for fishing expeditions to investigate mere speculation"); *see also Bemore v. Chappell*, 788 F.3d 1151, 1176-77 (9th Cir. 2015).

Petitioner has not shown good cause for production of the Texas letter and the exemplars used by the prosecution's handwriting expert. The text of the Texas letter is set forth on page 32 of the Report. As discussed above, the Court denies Petitioner's motion for an indefinite stay of proceedings while he looks for a handwriting expert, among other things. Moreover, Petitioner has not shown any reason to believe that, if the facts are fully developed, he would be able to demonstrate that he is entitled to relief. *Bracy*, 520 U.S. at 909. Petitioner was specifically asked at trial about the Texas Letter: "All of this is your words, not that inmate's words, right?" Petitioner testified, "Yes, it is my words." (7RT 2750; Dkt. No. 70-13.) Petitioner testified as to what he meant by the words in the Texas Letter. (7RT 2748, 2752; Dkt. No. 70-13.) Thus, whether or not another inmate actually handwrote one or more words in the Texas Letter would not render any existing ground for relief potentially meritorious.

Petitioner's motion is DENIED.

IT IS THEREFORE ORDERED that judgment be entered denying the Petition and dismissing this action with prejudice.

Dated: June 23, 2025            /s/ Valerie Baker Fairbank
                                _____
                                Senior U.S. District Judge